UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD G. BUEHLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:13-CV-2532 (CEJ) |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On April 17, 2007, plaintiff Edward Buehler filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., and supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq*., with an alleged onset date of January 6, 2005, which he subsequently amended to March 20, 2007. (Tr. 331-40, 341-43, 274). After plaintiff's applications were denied on initial consideration (Tr. 147-49), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 179).

Plaintiff and counsel appeared for a hearing on September 22, 2008. (Tr. 129-46). The ALJ issued a decision denying plaintiff's applications on October 28, 2008. (Tr. 150-62). On October 13, 2010, the Appeals Council granted plaintiff's request for review and remanded the matter to the ALJ for further proceedings.[1] (Tr. 163-67).

---

[1]The Appeals Council concluded: (1) the ALJ's determination of plaintiff's residual functional capacity (RFC) was not consistent with the record and failed to address plaintiff's physical and mental limitations; (2) the ALJ failed to address a treating physician's medical source opinion; and (3) the ALJ failed to obtain testimony from a Vocational Expert. The Appeals Council also noted that plaintiff had filed subsequent claims in June 2009 and directed the ALJ to associate the claims files.

Plaintiff appeared for hearings on February 2, 2011, and May 18, 2011. (Tr. 71-128, 38-70). The ALJ denied plaintiff's application in a decision issued on July 5, 2011, and the Appeals Council denied review on October 16, 2013. (Tr. 11-37, 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. <u>Evidence Before the ALJ</u>

### A. <u>Disability Application Documents</u>

In April 2007, plaintiff listed his disabling conditions as depression and arthritis in his hands, back, and knees. (Tr. 364-72). In a report filed in June 2009, he described his disabling conditions as osteoarthritis in his right knee and right middle finger, chronic rotator cuff tendonitis in his right shoulder, history of abscess and cellulitis in his left thigh, gastroesophageal reflux disease (GERD), depression bipolar, and ADHD. (Tr. 412-19). Between 1985 and 2005, he owned a construction company, and worked 8 hours a day, 6 days a week. He supervised two people. The work required him to climb ladders; use machines, tools and equipment; write bids; and deal with customer problems. He walked or stood for 8 hours a day, frequently lifted 50 pounds or more, and occasionally lifted 100 pounds. He stopped working in late December 2004 or early January 2005.

In a Function Report dated July 20, 2009, plaintiff stated that he spent his waking hours watching television, trying to clean up, or whatever he could do to help out. (Tr. 420-34). Mostly, he slept 16 to 18 hours a day. His meals were generally prepared by his children or girlfriend. He was able to drive and occasionally shopped for groceries, though he sometimes waited in the car while others shopped. He was able to count change but otherwise could not manage financial transactions because he did not "make good decisions or look for savings -- just want to get in and out." He spent time with his girlfriend and children. When asked about his interests and

hobbies, he listed watching television but stated he did not do so often. He identified his areas of difficulty as lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, using his hands, completing tasks, concentrating, understanding, following instructions, and memory. He was able to walk about a block before needing to rest. He reacted to stress with panic and heart palpitations; then he just wanted to sleep. He was worried about not being able to provide for his family and about going to jail for not paying child support. In a narrative section, plaintiff noted that he did not have medical insurance and was not presently taking his medications for ADHD and bipolar disorder. He was in severe pain from his arthritis.

## B.  <u>Hearing on September 22, 2008</u>

Plaintiff was 44 years old at the time of the hearing. (Tr. 131). He attended tenth grade and did not get a GED. He testified that he didn't have a permanent residence and was "floating" between friends' homes. (Tr. 141). His three children lived with their mother.

Plaintiff testified that he had chronic rotator cuff tendonitis and plantar fasciitis, and had undergone thumb fractures, ulnar nerve surgery, and a left carpal tunnel release. His doctor had told him that he needed replacements for knuckles in two fingers of his right hand. (Tr. 137). He had worked on his daughter's brakes the weekend before the hearing because she could not afford to pay for the work to be done. (Tr. 133). Even with help from his son, it took him "four or five, six hours" to complete the job over a two-day period and his hands were "killing" him. His hands typically became swollen a couple of days after he used them and after working on the car he couldn't close his right hand or grip a gallon of milk. Even when he refrained from strenuous activity, he had cramping and shooting pains in his hands, fingers, knuckles, and wrists. His right knee locked up or gave way, and he experienced pain

and swelling. Activity worsened the pain. He could comfortably stand for about 15 or 20 minutes and sit for an hour or two. The arthritis in his hands and knees was the primary barrier to working. (Tr. 142).

Plaintiff had a history of depression, with episodes occurring over the prior 10 to 15 years. The current episode began in 2002, after he was injured and acquired a staph infection that "laid [him] up" for eight months. (Tr. 138). His symptoms included sadness and sleeping 18 hours a day. Even when taking Adderall,[2] he slept three or four hours in the afternoon. The Adderall also helped with his ADHD, although he still lost things and struggled with his memory.

Plaintiff testified that he had had five or six MRSA infections.[3] An infectious disease doctor told him that the infections were stress-related. (Tr. 144-45).

Plaintiff's daily activities included some limited walking, watching television, or using a computer if available. Plaintiff did not have health insurance. When he could, he did small jobs such as painting for friends. (Tr. 142-43). They paid him small amounts of cash or bought his medicines.

## C.  Hearing on February 2, 2011

---

[2]Adderall, or amphetamine salt combo, is a combination of stimulants (amphetamine and dextroamphetamine) used to treat attention-deficit hyperactivity disorder and narcolepsy.  http://www.webmd.com/drugs/drug-63164-Adderall+XR+Oral%2F.aspx?drugid=63164 (last visited May 13, 2014) and http://www.pdrhealth.com/drugs/adderall (last visited on May 13, 2014).

[3]Methicillin-resistant Staphylococcus aureus (MRSA) is a bacteria that is resistant to many antibiotics. In the community, most MRSA infections are skin infections. In medical facilities, MRSA causes life-threatening bloodstream infections, pneumonia and surgical site infections. http://www.cdc.gov/mrsa/ (last visited Jan. 29, 2015).

At the time of the second hearing, plaintiff was living in a house with his girlfriend, her grandmother, her teenaged son, and his two teenaged children. (Tr. 77-78). He received food stamps and was on Medicaid. (Tr. 80-81).

From 1985 to 2005, plaintiff operated his own business doing residential remodeling. (Tr. 83). He had his own crew of three to five people and hired subcontractors for trade work. (Tr. 85-86). He handled estimates and bids. When asked what happened to the business, he testified that he shot himself in the leg with an air nailer in 2002 which resulted in several infections. His 2005 divorce "abolished" the business. (Tr. 83).

Plaintiff testified that his right knee was always painful and would become swollen. The knee was prone to buckling while he was walking or standing. He had arthritis in both hands, with the right being far worse than the left. In late 2010, plaintiff was hospitalized for four days to treat an abscess on his left hand. (Tr. 92). On December 2, 2010, during surgery to repair a tear in his right rotator cuff, it was discovered that the cartilage in his shoulder was gone. The surgeon made some remedial repairs, but told plaintiff that he needs a shoulder replacement. (Tr. 87-88).

Plaintiff had relied on Ibuprofen to treat pain because narcotics caused nausea. (Tr. 87). He had recently been prescribed anti-nausea medication and was taking the narcotics about three times a week. (Tr. 93). Plaintiff's GERD was controlled by over-the-counter medication. (Tr. 91). He had had another abscess three months earlier. He again testified that his physician believed these infections were stress related. (Tr. 92).

Plaintiff's mental impairments include ADHD and bipolar disorder, for which he was prescribed Lamictal,[4] Wellbutrin,[5] and Adderall by his primary care physician. (Tr. 89-91). Plaintiff described his bipolar symptoms as anger, mood swings, depression, lack of motivation, and sleeping. He described himself as very forgetful, and stated he frequently lost his keys, forgot appointments, and could forget to turn off the stove when cooking. (Tr. 104). His last psychiatrist refused to treat him any longer after he missed an appointment scheduled the same day as his surgery.

In response to questions from the ALJ, plaintiff acknowledged that he occasionally cooked or barbecued, loaded the dishwasher, and did laundry. He denied doing vacuuming or yard work. He attended some of his son's ball games and fished with his sons at the park. He could walk for 10 minutes and stand for 15 minutes before his knees began to hurt. (Tr. 98). He could sit for 30 minutes before he needed to change positions. He could lift 15 or 20 pounds with his left arm and nothing with his right.

The ALJ heard testimony from psychologist Gary Horner, Ph.D. Based on a review of plaintiff's medical records, Dr. Horner testified that plaintiff's mental impairments did not meet or equal any of the listings. (Tr. 118). He opined that plaintiff had mild to moderate restrictions in activities of daily living and maintaining social functioning, and moderate to marked restrictions in maintaining concentration, persistence, and pace. There were no episodes of decompensation.

---

[4]Lamictal, or Lamotrigene, is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on December 17, 2014).

[5]Wellbutrin, or Buproprion, is indicated for treatment of major depressive disorder. See Phys. Desk Ref. 1648-49 (63rd ed. 2009).

The ALJ asked Gary Weimholt, a vocational expert, to address plaintiff's vocational history and identify exertional and skill levels. (Tr. 121). Mr. Weimholt testified that plaintiff's past work was within the composite title of house builder, which is classified as medium work, and contractor, which is classified as light work; both titles have a Specific Vocational Preparation (SVP) level of 7. He had transferable supervisory and construction estimator skills.

Mr. Weimholt also testified about the employment opportunities for a hypothetical person with plaintiff's level of education, training and past work experience, with the ability to perform light work. (Tr. 121-22). In addition, the hypothetical individual could occasionally climb ropes, ladders, scaffolds, stairs and ramps; and could not reach overhead with his right arm. He could understand, remember and carry out simple instructions and nondetailed tasks; perform complex tasks; demonstrate adequate judgment to make simple work-related decisions; and perform repetitive work according to set procedures, sequence, or pace. Such an individual could perform plaintiff's past relevant work as a contractor, even if further restricted to performing "some complex tasks" only. An individual unable to perform any complex tasks would be precluded from work as a contractor but could do simple light assembly work or cashiering. (Tr. 123). An additional restriction on handling and fingering eliminated all but automated cashiering jobs and work as an information clerk. An individual who required three absences a month due to his mental condition would not be employable. (Tr. 124-25).

In response to questions from plaintiff's counsel, Mr. Weimholt opined that employment would be precluded for an individual with mental restrictions consistent with assessments by treating psychiatrist Melissa West, M.D., in 2007; and evaluator James Hurley, Ph.D., in 2010. (Tr. 126). Counsel also asked about the significance of

a Global Assessment of Functioning (GAF) score of 45, as assigned by consultative examiner, Sherman Sklar, a medical expert (M.E.), in 2009. Mr. Weimholt opined that a score of 45 could indicate severe problems in the ability to hold a job. When prompted by the ALJ, Mr. Weimholt concurred that GAF scores may not be accurate and can be a "one time snapshot." (Tr. 127).

### D. <u>Hearing on May 18, 2011</u>

Plaintiff submitted a new medication list. At the time of the February hearing, he had been taking 800 mg of Motrin twice a day, but he had since stopped because he had begun vomiting blood. He was taking Vicodin, which caused nausea, and Celebrex and was using an analgesic patch. (Tr. 42-43). The ALJ noted that orthopedic surgeon Robert Markenson, M.D., opined that plaintiff had the ability to lift 10 pounds frequently, 25 pounds occasionally, and stand or walk for eight hours, and sit for eight hours. (Tr. 45). Plaintiff disagreed with the assessment.

The ALJ heard testimony from Morris Alex, M.D., who is board certified in internal medicine. (Tr. 259-61). In reviewing the medical record, Dr. Alex noted that there was no evidence in the file of bilateral carpal tunnel syndrome surgery. (Tr. 49). Dr. Alex noted that, according to Dr. Inna Park, plaintiff was not able to make a fist with his right hand, but was able to touch all his fingers without any problem (see below). He had some decreased range of motion in the knees and hips but was able to get up and walk around without difficulty. Plaintiff's orthopedist Robert Markenson, M.D., stated in December 2007 and December 2010 that plaintiff was able to do light work. However, in 2010, Dr. Markenson also said that plaintiff needed a left shoulder and right knee replacement, which Dr. Alex identified as inconsistent with the light-work designation. Dr. Alex limited plaintiff to light work before shoulder surgery in September 2010 and sedentary work thereafter, with no capacity for reaching at any

time, and only occasional handling due to the frequency of plaintiff's staff infections. He should avoid excessive heat and cold and high humidity, climbing ladders and scaffolds, and dangerous machinery. (Tr. 51-52).

The ALJ also heard testimony from psychologist James Reid, Ph.D. (Tr. 54-61). Based on his review of the record, Dr. Reid concluded that plaintiff's disorders did not meet Listings 12.02 (organic mental disorders) or 12.04 (affective disorders). Dr. Reid opined that the assessment of plaintiff's depression and bipolar disorder was complicated by the evidence in the record that plaintiff misused Adderall, which could contribute to irritability, mood swings, and inability to concentrate. Indeed, he opined that he did not believe that plaintiff has bipolar disorder. (Tr. 56-57). He noted that in 2011 plaintiff's primary care physician found no emotional stress, insomnia, or depression. (Tr. 57) (discussing Dr. Fortunato's notes).[6] Based on inconsistencies in the records, Dr. Reid disagreed with the limitations assessed by Dr. West and Dr. Hurley, and the GAF score assessed by Mr. Sklar. (Tr. 57-58, 61). Dr. Reid further opined that plaintiff had mild impairments in the activities of daily living, social functioning, and concentration, persistence and pace for simple tasks. (Tr. 59).

Robin Cook, Ph.D., testified as a vocational expert. She characterized plaintiff's past work as a combination of construction superintendent, carpenter, and roofer, all of which are skilled work with an SVP of 7. (Tr. 64-65). Dr. Cook considered the employment options for a person of plaintiff's education, training and work experience, who was limited to performing light work, with no overhead reaching; who had the

---

[6]In response to questioning from plaintiff's counsel, Dr. Reid agreed that most primary care physicians don't complete full mental status examinations and that the information required to complete a medical source statement is more detailed than what is sought in a general psychiatric or psychological evaluation or treatment session. (Tr. 59-60).

ability to understand, remember and carry out simple instructions and non-detailed tasks, and adequate judgment to make simple work related decisions; and who could adapt to routine, simple work changes and perform repetitive work. A person with these limitations could not perform plaintiff's past work. (Tr. 65). However, the individual would be able to perform work as an office helper or furniture rental helper. An individual who was additionally limited to only occasional handling and gross manipulation would still be able to perform work as a furniture rental helper, at the light level, or call-out operator, at the sedentary level. (Tr. 66-67). However, employment was precluded at the sedentary level for an individual with restrictions on manipulation who was also limited to infrequent, casual contact with others. (Tr. 68).

### E. <u>Medical Records</u>

In April 2002, plaintiff accidently shot a nail into his right knee with a nail gun and sustained damage to the cartilage. (Tr. 569-70 Apr. 21, 2004 letter by Robert I. Markenson, M.D.). After his initial surgery, plaintiff developed swelling which required aspiration on several occasions. He underwent surgery again on August 13, 2002 to remove a cyst and repair a meniscal tear, followed by two more surgical procedures to address recurrent infections. In addition to the damage to his right knee, notes from Dr. Markenson in early 2004 refer to incisions and infections in plaintiff's left arm and right hand. (Tr. 571). In March 2004, Dr. Markenson noted that improvement in numbness in range of motion in his right finger. <u>Id.</u> Dr. Martenson prescribed an antibiotic and Lorcet Plus[7] throughout early 2004.

---

[7]Lorcet Plus is a combination product containing Acetaminophen and Hydrocodone. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html (last visited on Mar. 16, 2015)/

Plaintiff had his first appointment with primary care physician Kristen A. Scullen, M.D., on May 25, 2004. (Tr. 483). He reported that he was diagnosed with attention deficit disorder while he was doing construction work in Texas. He complained of being very tired during the day. He stated that, after trials on other medications, he was prescribed Paxil and 80 to 120 mg of Adderall. Dr. Scullen prescribed Adderall at no more than 60 mg a day and referred plaintiff to a psychiatrist to review his diagnoses and medication needs. At his next office visit in June 2004, plaintiff reported stiffness in one finger and an inability to grasp. (Tr. 487). He complained of sleepiness during the day and depression. Dr. Scullen agreed to continue prescribing Adderall pending plaintiff's future appointment with psychiatrist Melissa West, M.D.

In the latter half of 2004, Dr. Markenson treated plaintiff for pain in his right hand and shoulder. (Tr. 567, 579, 566). Dr. Markenson noted that plaintiff needed carpal tunnel surgery for his right wrist. (Tr. 566). In December 2004, plaintiff required treatment for an abscess on his right leg. (Tr. 509-33, 485-86). In the first half of 2005, Dr. Markenson treated plaintiff for plantar fasciitis and other problems in his right foot, and epicondylitis and arthritic changes in the right elbow. (Tr. 564-65).

In July 2005, plaintiff was hospitalized for a MRSA infection on his left thigh. (Tr. 455-78). When oral and IV antibiotics failed, he underwent surgical incision and drainage. (Tr. 466). He underwent yet another incision and drainage of the abscess on an outpatient basis in November and was readmitted to the hospital in December 2005 for treatment with IV antibiotics. (Tr. 494). In December 2005, he broke his thumb and saw Dr. Markenson for debridement of the wound. (Tr. 563). Dr. Markenson provided follow-up treatment through February 2006. (Tr. 561-62).

The next entry in the medical record is dated January 22, 2007, when plaintiff sought emergency treatment for chest pain. (Tr. 534-53). He reported that he had

taken extra Adderall over the last several days in order to "get stuff done at his house." (Tr. 537). He had not slept the previous night. He was assessed with atypical chest pain, probable gastritis or esophagitis, and Adderall abuse. He declined to be admitted for observation or a stress test and said he would follow up with his primary care physician. (Tr. 538).

Plaintiff transferred his psychiatry care from Dr. West to Terry D. Guiley, D.O., on March 20, 2007. (Tr. 587-92). Plaintiff reported that he became depressed when he was unable to work for 8 months after his 2004 injury and divorce in 2005. He improved in 2006, until a friend died in December. Since then, he experienced crying and morbid thoughts and felt sad and angry. He was forgetful and fatigued and wanted to sleep excessively. He had stopped taking Lamictal several months earlier and had just stopped taking Adderall, and hoped to get off all medications. (Tr. 588). Dr. Guiley described plaintiff as alert and oriented, tearful, and with a depressed affect. He diagnosed plaintiff with ADHD and dysthymia, rule out major depression, and assigned a GAF score of 60.[8] In April 2007, plaintiff reported that he was totally weaned off Adderall. He was feeling depressed and continued to have morbid thoughts. Dr. Guiley increased the dosage of plaintiff's Wellbutrin. (Tr. 594). A few days later, plaintiff reported that the increased dosage caused heart palpitations and elevated blood pressure and Dr. Guiley reduced the dosage again. (Tr. 593).

On April 16, 2007, Dr. Markenson noted that plaintiff's worsening arthritic condition was causing swelling, pain and decreased range of motion of a finger in his

---

[8]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

right hand. He opined that plaintiff's arthritic knees and history of elbow surgery would make it difficult to work. (Tr. 557).

On July 5, 2007, Inna Park, M.D., completed a consultative evaluation. (Tr. 597-602). Plaintiff reported that his arthritic symptoms started in his thirties and had worsened over the last two to three years. He had the most pain in his hands, especially his right hand, and his knees. His back and shoulders were also problematic. He had four arthroscopic knees surgeries and multiple steroid injections to his knees, knuckles, right shoulder and right elbow. He used to play softball five nights a week and run 5 or 6 miles a day, but could no longer do so. He did some household upkeep, light housework, and laundry, and recently did some painting for about two hours. On examination, plaintiff had no muscle spasm or palpable tenderness of the spine. He was able to get on and off the examining table without difficulty and had a normal gait and station. He moved around the room with ease. He could not make a closed fist with his right hand, but was able to touch his fingers together, and had normal fine and dextrous finger control. He had swelling in his left hand but no functional limitations. He had decreased range of motion in the knees and hips and somewhat reduced strength in his right shoulder due to pain. Dr. Park's clinical impression was arthritic problems, with worsening symptoms over the past two to three years.

On July 9, 2007, Dr. Scullin noted that plaintiff's depression was stable but his ADHD had worsened. (Tr. 680-81). On physical examination, Dr. Scullin noted that plaintiff had tenderness and swelling in his hand. He had full range of motion and muscle strength in his legs. Plaintiff said that he had been unable to reach Dr. West and Dr. Scullin refilled his Adderall for one month. Two days after the office visit,

however, Dr. Scullin noted that plaintiff had been terminated by Drs. West[9] and Guiley with concerns about overuse of amphetamines.

On July 20, 2007, a Physical Residual Functional Capacity Assessment was completed by single decisionmaker S. Batchelor,[10] who concluded that plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and could stand or walk for 6 hours in an 8-hour day. (Tr. 603-08). Some weight was given to Dr. Markenson's opinion that plaintiff would have difficulty performing gainful employment due to arthritic changes in his hands, elbows, and knees. It was noted that there were no imaging studies to support plaintiff's claim of osteoarthritis in the shoulders[11] or knees.

Also on July 20, 2007, James Spence, Ph.D., completed a Psychiatric Review Technique. (Tr. 609-19). Dr. Spence concluded that plaintiff's diagnoses of ADHD and dysthymia met the criteria for organic and affective disorders, but that his impairments were not severe. Dr. Spence found that plaintiff had mild limitations in the areas of maintaining activities of daily living, managing social functioning, and maintaining persistence, pace and concentration. Dr. Spence noted that plaintiff told Dr. Guiley that he was coaching his son's sports team and was looking forward to potential work. He

---

[9]Plaintiff resumed treatment with Dr. West on July 23, 2007 (see below). Her treatment notes indicate that she addressed diversion and overuse of Adderall with plaintiff, but she consistently prescribed it for him.

[10]Missouri is one of 20 states in which nonmedical disability examiners are authorized to make certain initial determinations without requiring a medical or psychological consultant's signature. See Office of the Inspector General, Audit Report Single Decisionmaker Model – Authority to Make Certain Disability Determinations without a Medical Consultant's Signature. (Aug. 2013).

[11]Even when imaging studies were done, they did not reveal the extent of the damage to plaintiff's right shoulder. See Tr. 972-73 (Dr. Markenson's surgical notes from Dec. 2010 show that condition of plaintiff's shoulder was much worse than was revealed by x-rays and MRI).

was no longer taking medication for ADHD. Plaintiff's allegations of difficulties with memory and concentration were only partly credible.

Plaintiff resumed treatment with Dr. West on July 23, 2007. (Tr. 746-47). She noted that Dr. Guiley "fired" him for requesting more that 30 mg of Adderall twice a day – a dosage which plaintiff described as providing no benefit. Plaintiff absolutely denied diverting his prescription. He reported poor concentration, daytime sleepiness, and hypersomnia. He also had a depressed mood, which he attributed to being unable to work. Plaintiff described himself as overwhelmed, distracted, unable to focus on work, and making mistakes. He had a low tolerance for frustration and was escaping by taking naps. Plaintiff reported that Wellbutrin helped "a bit" but that 60 pills had been stolen from his car. Dr. West diagnosed plaintiff with ADHD, combined, severe; hypersomnia; and dysthymic disorder or cyclothymic disorder. After discussing adherence to his prescriptions, she prescribed 400 mg of Provigil, 120 mg of Adderall, and 300 mg of Wellbutrin. She noted that plaintiff required a sleep evaluation to rule out narcolepsy.[12] Plaintiff received elevated scores on scales testing for inattention, sleepiness, and fatigue. (Tr. 748-51).

On August 28, 2007, plaintiff presented to Dr. West with low motivation, fatigue, excessive sleepiness and anhedonia. (Tr. 745). He reported that Adderall helped him to focus and do things around the house without making careless mistakes; it also helped with pain in his hand. He slept 7 hours at night and 3.5 hours during the day. Provigil gave him a rash and caused nausea. Dr. West's  diagnoses were ADHD, combined; cyclothymia, rule out bipolar disorder; and depression. She decreased plaintiff's Adderall over time and increased his Wellbutrin to 450 mg a day.

---

[12]The sleep study showed that plaintiff snored loudly and was not rested. (Tr. 744).

On September 5, 2007, Dr. Scullin noted that an abscess on plaintiff's right shoulder had worsened. (Tr. 684-85).

On September 18, 2007, plaintiff returned to Dr. West's office accompanied by his fiancee. (Tr. 744). He reported that 450 mg of Wellbutrin helped his mood but caused heart palpitations. He also reported that he was depressed, irritable, and staying in bed without Adderall. Plaintiff's fiancee agreed to hold his medications and Dr. West resumed Adderall at either 180 or 240 mg a day and discontinued the Wellbutrin. In October 2007, plaintiff told Dr. West he was doing well. (Tr. 707). He had improved focus and cognition and was able to work. His mood was stable and he described himself as relaxed and mellow. He was sleeping 9 hours a night and had good energy.

A week later, on October 26, 2007, plaintiff presented at the emergency room at St. Anthony's Medical Center with chest pains, numbness in his right arm, and shortness of breath. (Tr. 644-78). He reported that he was very tired and jittery and that he might have mistakenly taken three Adderall instead of aspirin. (Tr. 649). Four days later plaintiff was admitted to St. John's Mercy Medical Center with chest pains. (Tr. 720-30). Cardiac stress tests were normal. (Tr. 726). Plaintiff reported that he had been taking 240 mg of Adderall a day for about a year, in addition to drinking a case of soda every day, both of which were identified as possible causes for his symptoms. He had recently quit smoking. (Tr. 720, 721). On examination, plaintiff denied a history of depression. (Tr. 721).

On November 20, 2007, plaintiff told Dr. West that he had lost his wallet with $600 cash and $1,500 of store credits. Nonetheless, his mood was "ok". Dr. West refilled his prescription for Adderall.

Dr. West also completed a medical source statement on November 20th. (Tr. 708-09). She rated as "poor" plaintiff's abilities to relate to co-workers, deal with the public, interact with supervisors, deal with work stress, and maintain attention and concentration. She rated as "fair" his abilities to follow work rules, use judgment, and function independently. In support of these ratings, she noted that he was likely to get into conflict, had an irritable mood, did not cope with "normal" stress, and had very impaired attention and concentration. She also rated as "poor" his ability to understand, remember, and carry out complex or detailed instructions, and as "fair" his ability to deal with simple instructions. She cited his poor concentration, forgetfulness, inattention, distractability, and disorganization. Finally, she rated as poor his abilities to behave in an emotionally stable manner, relate predictably, and demonstrate reliability. She stated that he was easily irritated, with a low frustration tolerance. He was unable to keep appointments due to disorganization and forgetfulness. He had severe, combined ADHD, and his impulsivity impaired his ability to function at any job. His mood disorder affected his reliability, ability to interact with supervisors and the public, and ability to work at any job.

On December 6, 2007, Dr. West noted that plaintiff was depressed and tearful. (Tr. 706). He had been without medications for two weeks after he lost them. He was irritable and sleeping 18 out of 24 hours. Dr. West started a prescription for Lamictal and prescribed 240 mg of Adderall. At his next office visit on December 22, 2007, plaintiff presented with depressed mood, low energy and some irritability. He denied any cardiac symptoms. Dr. West continued his Adderall at the same levels and resumed Wellbutrin.

In a letter to plaintiff's counsel dated December 21, 2007, Dr. Markenson wrote that plaintiff was able to lift up to 25 pounds at least one third of the day, could stand

and walk 3 to 4 hours, and could sit for 8 hours in an 8-hour day. (Tr. 622). He was limited to 2 to 3 hours of pushing and pulling in an 8-hour day. Additional rest periods might be necessary. He could occasionally climb, bend and stoop; and should never kneel or crouch. Reaching was limited to "occasionally," while handling and fingering were limited to "occasional to frequent." Dr. Markenson described plaintiff's conditions as post-traumatic arthritis of one knee, degenerative arthritis of one finger, slight degenerative arthritis of a previously fractured thumb, prior ulnar nerve surgery of one elbow, carpal tunnel release surgery on his left arm, and trigger-finger release surgery on a right finger. Plaintiff also had surgery on his left knee for a medial meniscectomy, problems with recurrent popliteal cysts on both knees, plantar fasciitis in his heels, and chronic epicondylitis of his elbows. Finally, he had chronic rotator cuff tendonitis.

On January 15, 2008, plaintiff was admitted to St. John's Mercy Medical Center for excision of an infected cyst and surrounding abscess from his right shoulder and treatment with IV antibiotics. (Tr. 714).

On January 22, 2008, plaintiff told Dr. West that he had not taken Adderall for one week. (Tr. 705). He reported that his mood was better overall and more stable, though he had some depressed periods. He described himself as more playful and enjoying life more. He was sleeping well, though he did not feel rested and had daytime sleepiness and napping. Dr. West diagnosed plaintiff with Bipolar Disorder I, depressive episode. She increased his Lamictal dosage, continued his Wellbutrin unchanged, and decreased his Adderall to 180 mg. On January 30, 2008, plaintiff told her his Adderall had gone through the wash. He denied diverting his medication. His mental status was appropriate and he had no mania, paranoia, or suicidal ideation. Id. On February 18, 2008, Dr. West increased plaintiff's Adderall dosage to 240 mg a day when he reported that he experienced "rebound" in the late afternoon. On March 3,

2008, plaintiff reported that he was "busy," and was doing work on cars and the house. (Tr. 704). He was focusing well and was organized. His mood was decent, though he had some irritability. He had not had any outbursts of anger. He had intermittent hand pain, which he was treating with over-the-counter medications. Dr. West prescribed 300 mg of Wellbutrin, 100 mg of Lamictal, and 240 mg of Adderall.

Plaintiff did not appear for scheduled appointments with Dr. West on March 20 or April 5, 2008. (Tr. 703). On April 16, 2008, he told Dr. West that he was doing well with good sleep and a stable mood. He was focusing well. Id. He stated that he was leaving for 6 to 8 weeks in Texas. She authorized a 3-month supply of his medications.

On July 4, 2008, plaintiff called Dr. West and reported that he was out of Adderall and was experiencing hypersomnia. (Tr. 703). He said he had quit work. At his request, Dr. West mailed him a prescription for Vyvase and told him to schedule an appointment as soon as possible. He appeared for an office visit on July 16, 2008. (Tr. 702). He said he threw his medications away at the end of June and was irritable and "sleeping all day and night." He had quit his job in Texas because it was too much work and was stressful. Now, he was experiencing severe fatigue, anxiety, and irritability. He was unable to work and he was having relationship conflict. Dr. West noted that he was in a depressed, tearful mood, with suicidal ideation but no plan or intent. His concentration and memory were "terrible." Dr. West prescribed Vyvase and Abilify. On July 25, 2008, he was still sleeping around the clock, and complained of extreme fatigue, anhedonia, and irritability. (Tr. 701). Dr. West discontinued the Vyvase because it caused a rash and prescribed 240 mg of Adderall, Lamictal, and Wellbutrin.

On August 11, 2008, plaintiff went to the emergency room with intermittent chest pains and tingling in his hands and legs. (Tr. 635). He had red blotches on his chest and torso. The record notes that he "mixed Adderall/[Zegerid]." Plaintiff left

before being seen by the physician. (Tr. 637). He returned two days later with a rash, chest pain, and a swollen throat. (Tr. 625). It was determined that he was allergic to Zegerid.[13] He was treated with Benadryl and steroids.

On August 14, 2008, plaintiff told Dr. Scullin that he consumed 24 cans of soda every day. (Tr. 689). Dr. Scullin advised him to limit his soda intake to two cans per day.

On September 13, 2008, Dr. West reaffirmed her medical source statement from November 20, 2007. (Tr. 710). On September 26, 2008, plaintiff told her he was forgetful and thought he was losing his mind. He was anxious about his disability hearing. His girlfriend complained that his going out at night kept her awake. Dr. West opined that plaintiff was reacting to situational stress and continued his current medications. On October 10, 2008, plaintiff called for another prescription, explaining that the last one had accidentally been placed in the laundry before he filled it. (Tr. 736). However, Walgreens confirmed that a prescription had been filled after his last office visit. Nonetheless, on October 11, 2008, Dr. West phoned in a prescription for 15 days of Adderall at the prior dosage level.

On October 28, 2008, plaintiff told Dr. Scullin that his psychiatrist had retired and that he needed his prescriptions refilled. He also complained of pain in his left armpit and sharp pain in his chest. (Tr. 895-96). She refilled his medications temporarily and referred him to a psychiatrist.

There is a gap in the record until April 2009, when plaintiff saw Dr. Scullin for complaints of body aches and congestion. (Tr. 902-03). He had been unable to find another psychiatrist. Dr. Scullin refilled his psychiatric medications but warned him to

---

[13]Omeprazole, or Zegerid, is used to treat GERD. http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a693050.html (last visited on March 18, 2015).

find a new psychiatrist. On May 28, 2009, plaintiff reported that he had a new psychiatrist. (Tr. 909-10). On June 17, 2009, Dr. Scullin noted that plaintiff was sleeping 18 hours a day and was tearful. In addition, his arthritis was worse and he had an abscess on his right shoulder. Dr. Scullin planned to speak to the new psychiatrist about the rapid reduction in plaintiff's Adderall. (Tr. 914-15). Two days later, she noted that his psychiatrist had diagnosed plaintiff with drug addiction and terminated him from psychiatric care. (Tr. 920). Plaintiff was not to be given any future prescriptions for Adderall or other controlled substances. (Tr. 921).

On July 1, 2009, plaintiff reported to Dr. Scullin that he was off all prescription medications and was scheduled to see a new psychiatrist in August. He complained of chronic fatigue and numbness in his toes. (Tr. 925-26). Two weeks later, plaintiff reported that he was sleeping a lot and had pain in his shoulder. (Tr. 929-30). He was upset because he was still waiting for a psychiatric appointment to receive medication for his ADHD. Dr. Scullin's office was unable to get him an earlier appointment.

On August 6, 2009, plaintiff called Dr. Markenson's office and asked for a prescription for pain medicine. (Tr. 792). Dr. Markenson required him to come for an office visit before he would authorize a prescription. Plaintiff was seen the next day. He had multiple complaints of aches in his hands, knees and shoulders. On examination he had limited range of motion of the shoulder. Dr. Markenson prescribed a corticosteroid and Tramadol for pain.

Plaintiff had an initial appointment with psychiatrist Lawrence F. Kuhn, M.D., on August 24, 2009. (Tr. 955-58). Plaintiff complained of irritability, anger, frustration, and low energy and interests. He reported that he had a history of losing his temper. As a young person, he smoked marijuana and used cocaine, which "mellowed him." (Tr. 957). He got into a lot of fights as an adolescent and had a number of arrests (but

no convictions) for assaults, burglary, and stealing. He quit school his freshman year and his father made him get a job in construction. He started his own construction business when he turned 21. He became depressed after injuring himself in 2002. He had tried numerous medications. He claimed that 300 mg of Wellbutrin caused anxiety and heart palpitations and 150 mg of Lamictal made no difference. Dr. Kuhn's impression was Bipolar II and ADHD. He prescribed 200 mg of Lamictal and 150 mg of Wellbutrin. On September 4, 2009, Dr. Kuhn added a prescription for 120 mg of Adderall. (Tr. 954).

Llewellyn Sale, Jr., M.D., completed a consultative examination of plaintiff on September 8, 2009. (Tr. 795-98). On examination, Dr. Sale noted that plaintiff was obese. He had slight tenderness in the lumbar area, no paraspinal muscle spasm, and flattened lordotic curve. He was able to walk and get on and off the examining table without difficulty. He could walk on his heels but not his toes. He could not squat and had minimal flexion of the right knee. His right arm was slightly weaker than his left and he had decreased finger control and grip strength. Pain interfered with movement of the right shoulder blade and examination of plaintiff's right hand and wrist. Plaintiff had full strength in both legs, but pain made straight leg raising on the left side "almost impossible." Dr. Sale's clinical impressions were: (1) degenerative joint disease in several joints, particularly both hands, right shoulder, and the lumbar spine to a minimal degree; (2) multiple abscesses requiring incision and drainage; (3) chronic right shoulder problem, said to be due to rotator cuff tendonitis, with marked impairment of movement, tenderness, and pain; (4) chronic reflux disease; and (5) possible hypertension. (Tr. 798).

Also on August 8, 2009, Sherman Sklar, M.E., completed a psychological evaluation of plaintiff. (Tr. 804-09). Mr. Sklar described plaintiff as a good reporter,

cooperative, friendly and outgoing, and as expressing emotions in an appropriate manner. Plaintiff's chief complaints were that he usually slept too much, had poor concentration, was forgetful, had low motivation, and was generally tired and sad. His medications included 200 mg of Lamictal, 150 mg of Wellbutrin XL, and 120 mg of Adderall. He felt the medications helped. Even so, he slept 18 hours a day and was chronically sad and had suicidal thoughts. Medication gave him better control over his anger. His self esteem was pretty high but he felt guilty about being unproductive. His daily regimen included getting up with his children and seeing them off to school, and then returning to bed or watching television. He got up to greet the children when they came home but then went back to bed. He did not socialize outside his family.

On examination, plaintiff teared up once and his affect reflected moderate depression. He seemed to have little insight into his own moods and behaviors. There were no signs of a thought disturbance. He was well-oriented and displayed no memory deficits or problems in abstract reasoning. His calculation abilities and social awareness were intact. Mr. Sklar diagnosed plaintiff with ADHD, predominantly inattentive type, and Major Depressive Disorder, recurrent, moderate in severity, and assigned a GAF score of 45.[14] Mr. Sklar summarized as follows:

> Mr. Buehler had a long history of dysfunctional behavior which was manifested in school and he was kicked out of several elementary schools and high school. He only completed the 8th grade, although he was in a regular school program. He went to work and worked for himself for many years in construction until medical issues and stress from his divorce overwhelmed him and he has been unemployed since then. He continues to have concentration deficits and problems with depression. Sleep is a significant defense for him and he spends most of the day in

---

[14]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

a sleep mode. He is seeing a psychiatrist and . . . tak[ing] medications that . . . help.

(Tr. 808).

On September 28, 2009, Dr. Kuhn increased the dosage of plaintiff's Lamictal. (Tr. 953).

James Spence, Ph.D., completed a second Psychiatric Review Technique on September 8, 2009. (Tr. 814-24). This time, Dr. Spence found that plaintiff had severe impairments of ADHD, inattentive type, and Major Depressive Disorder, recurrent. He opined that plaintiff was moderately limited in the areas of maintaining activities of daily living and maintaining persistence, pace and concentration, and had no limitation in maintaining social functioning. In support, Dr. Spence cited Mr. Sklar's finding that plaintiff had normal concentration and notes in the record showing he was able to focus when working on cars and his house. Dr. Spence also found that plaintiff was moderately limited in the abilities to understand, remember, and carry out detailed instructions, and to maintain attention and concentration for extended periods. (Tr. 811-13). Dr. Spence opined that plaintiff was capable of completing simple repetitive tasks on a sustained basis and would "likely improve with appropriate treatment." (Tr. 824). Finally, Dr. Spence also noted that the medical record reflected significant issues related to drug-seeking behaviors and that several doctors had terminated him from treatment as a result.

On October 12, 2009, plaintiff told Dr. Kuhn's office that he had washed his medications and needed new prescriptions. He was given prescriptions for 30-day supplies of Adderall and Wellbutrin. (Tr. 952). Two weeks later, plaintiff again received prescriptions for 30-day supplies of Adderall and Wellbutrin. (Tr. 951).

On October 28, 2009, Dr. Scullin noted that plaintiff was "being treated for Strep" and was getting better with antibiotics. (Tr. 933-34). He displayed mild anxiety and complained about having palpitations for three weeks, which Dr. Scullin attributed to his caffeine intake (12 sodas and chocolate every day), but noted that his medications and anxiety might be contributing factors. A 24-hour period of cardiac monitoring showed innocent extra heart beats. (Tr. 967-68). Plaintiff was instructed to reduce his caffeine intake.

On November 9, 2009, plaintiff told Dr. Kuhn's office that he did not fill his last prescription for Adderall and received a prescription for an additional 30-day supply. (Tr. 950). On November 30, 2009, plaintiff told Dr. Kuhn's staff that he was authorized to take 6 Adderall tablets daily and needed another prescription. On December 7, 2009, plaintiff told Dr. Kuhn his anger was better controlled and his mood was stable. Prescriptions were mailed to him on December 14, 2009. (Tr. 948-49). On December 28, 2009, plaintiff stated he had lost his medication while on vacation. Dr. Kuhn declined to provide a refill at that time. At an office visit on January 6, 2010, plaintiff stated that he got engaged on Christmas day. He lost his medications and his mood was lower since not taking Adderall. Dr. Kuhn continued his prescription for 180 mg of Adderall a day. (Tr. 947). On February 8, 2010, plaintiff stated he was doing repair work at his grandmother's home. (Tr. 945). On March 26th, Dr. Kuhn told plaintiff that he could not receive another prescription until May 2010. (Tr. 944). However, on April 14, 2010, Dr. Kuhn noted that plaintiff's mood was stable and filled all prescriptions. (Tr. 943).

On April 26, 3010, Dr. Markenson noted that plaintiff had weakness and pain in his right shoulder after doing some construction work. (Tr. 1028). On examination, he had limited range of motion. Dr. Markenson expressed uncertainty about the cause of

plaintiff's shoulder pain but opined that plaintiff no longer had the capacity to do construction work. He injected the shoulder and provided the steroid Medrol.

James Hurley, Ph.D., completed a record review and psychological evaluation on May 10, 2010. (Tr. 961-66). Plaintiff reported that he stopped working in 2004 due to pain and difficulty dealing with people and controlling his temper. He stated that he had always had mood swings. His psychiatric medications helped, but he still struggled for emotional control. For treatment of arthritis pain, he relied primarily on over-the-counter medications. In addressing plaintiff's social functioning and daily activities, Dr. Hurley noted that plaintiff generally lacked motivation to do things and when he was active he had to be careful because of his physical limitations. He watched some television and did some light cleaning. He could go to the grocery store but did not like to. He had no hobbies and did not socialize. He was emotionally overwhelmed by not being able to work and be a provider. His divorce left a lot of emotional scars.

On examination, plaintiff made good eye contact and was friendly, cooperative and interactive. His behavior was appropriate, he was fully oriented, and there was no evidence of thought disorder. Dr. Hurley described plaintiff's affect and mood as "rather neutral," noting that plaintiff responded appropriately but did not show a lot of emotion. (Tr. 964). He displayed fair insight and judgment. His intellectual functioning was estimated to be average, and his memory and concentration were poor, especially for concentrated tasks.

Plaintiff reported that he had problems standing, did not find walking too bothersome, and had no difficulty with sitting, other than boredom. He could not lift more than 5 pounds. His ADHD made it hard for him to do any task for long. Dr. Hurley diagnosed plaintiff with Bipolar Disorder (NOS), ADHD (combined type); arthritis and pain in his hands, knees, and shoulder; and moderate to severe stressors. He assessed

his GAF as 50. Dr. Hurley considered plaintiff's prognosis to be guarded due to his arthritis and pain, which was a constant stressor that made his emotional issues difficult to deal with. Dr. Hurley rated as poor plaintiff's abilities to deal with work stress, maintain attention and concentration, understand, remember, and carry out complex instructions, and demonstrate reliability. Dr. Hurley noted that plaintiff's mood swings were not completely controlled with medication and he still had episodes of anger and avoided social contact.

In May 2010, plaintiff twice sought emergency treatment for a lesion on his nose, diagnosed as a staph infection or cellulitis. He left against medical advice the first time, citing the long wait time. (Tr. 1010-14, 1005-09). In September 2010, he was admitted for treatment with IV antibiotics of an abscess on his left hand. (Tr. 979-97; 998-1004).

Also in September 2010, Dr. Markenson determined that plaintiff required arthroscopic surgery for his right shoulder, but had to wait until he received Medicaid coverage. (Tr. 1026). Surgery was completed on December 2, 2010 and revealed that the condition of plaintiff's shoulder was much worse than had been shown by x-rays and an MRI. (Tr. 972-73). Plaintiff had a severe grade 4 glenoid labral tear, a slap lesion with severe tearing of the biceps insertion and biceps tendon, and significant chondromalacia,[15] with bone exposed over the humeral head and glenoid. At a post-operative visit on December 9, 2010, Dr. Markenson noted that the changes in plaintiff's shoulder were relatively severe and he would require shoulder replacement in the near future. (Tr. 1025). In a medical source statement completed on September 10, 2010, Dr. Markenson opined that plaintiff could lift up to 10 pounds frequently and

---

[15]The softening and breakdown of cartilage inside a joint. http://www.drugs.com/health-guide/chondromalacia.html (last visited on March 19, 2015).

25 pounds occasionally, with no overhead work. (Tr. 1015-16). He could stand, walk, or sit 8 hours of an 8-hour day, and push or pull for 2 hours. He could occasionally bend, kneel, reach, handle, and finger. He did not require rest periods. On January 4, 2011, Dr. Markenson noted that plaintiff was making only slow progress in recovering from surgery due to significant degenerative arthritis, and opined that plaintiff would have chronic problems until he had shoulder replacement. (Tr. 1030). He prescribed Compazine and Norco.

On January 20, 2011, primary care physician Vincent P. Fortunato, M.D., completed a history and physical examination of plaintiff. (Tr. 1034-38). On examination, Dr. Fortunato found plaintiff to be cooperative and oriented, with normal mood. Plaintiff's gait and reflexes were normal. Dr. Fortunato's assessment was localized osteoarthritis of the knee, GERD, bipolar disorder, and tobacco abuse. He prescribed daily dosages of 60 mg of Adderall XR, 150 mg of Wellbutrin XL, and 400 mg of Lamictal. He referred plaintiff for psychiatric treatment. In March 2011, plaintiff complained of knee pain and had an abscess on his forehead. (Tr. 1039-42).

On April 4, 2011, Dr. Markenson noted that plaintiff still had significant pain in his right shoulder and needed a shoulder replacement. (Tr. 1028). On April 26, 2010, Dr. Markenson completed yet another medical source statement. (Tr. 1043-44). This time, he opined that plaintiff should not lift more than 5 pounds with his right arm, could stand or walk for 2 hours and sit for 4 hours in an 8-hour day, and needed to rest for 30 minutes 3 to 4 times a day. Dr. Markenson stated that his assessment was supported by the recent evaluation of plaintiff's right shoulder, and x-rays of his hands, knees, and shoulder.

On May 5, 2011, Dr. Fortunato noted that plaintiff had heartburn and was vomiting blood. (Tr. 1047-50). He was taking nine ibuprofen pills a day plus

nonsteroidal anti-inflammatory medication. He complained of limited range of motion and pain in his right shoulder. Dr. Fortunato continued plaintiff's Wellbutrin XL, Lamictal, Adderall XR, and added Adderall, Flexeril, Nexium, and Carafate. On May 14, 2011, Dr. Fortunato completed a medical source statement. (Tr. 1045-46). He opined that plaintiff should not lift more than 5 pounds, could stand or walk for a total of 2½ hours and sit for 4½ hours in an 8-hour day, and should rest for 60 minutes 4 times a day. He could frequently handle or finger, but should avoid all environmental hazards.

### III.  The ALJ's Decision

In the decision issued on July 5, 2011, the ALJ made the following findings:

1.    Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008.

2.    Plaintiff has not engaged in substantial gainful activity since March 20, 2007, the amended alleged onset date.

3.    Plaintiff has the following severe impairments: osteoarthritis of the right knee and finger, right rotator cuff tendonitis, GERD, obesity, ADHD, and depression (bipolar).

4.    Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the residual functional capacity to perform light work except that he cannot climb ropes, ladders, and scaffolds; cannot reach overhead; can only occasionally perform handling and gross manipulation; and must avoid concentrated exposure to hazards. He can understand, remember, and carry out at least simple instructions and perform nondetailed tasks; and can demonstrate adequate judgment to make simple work-related decisions, adapt to routine simple work changes, and can perform repetitive work according to set procedures, sequence, or pace.

6.    Plaintiff is unable to perform his past relevant work.

7.    Plaintiff was 43 years old, and thus a younger individual, on the alleged disability onset date.

8.   Plaintiff has a limited education and is able to communicate in English.

9.   Plaintiff has acquired work skills from past relevant work.

10.  Considering plaintiff's age, education, work experience, and RFC, plaintiff has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy, such as furniture rental consultant and call-out operator.

11.  Plaintiff has not been under a disability within the meaning of the Social Security Act from March 20, 2007, through the date of the decision.

(Tr. 17-31).

## IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See

20 C.F.R. § 404.1520; <u>Moore v. Astrue</u>, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. <u>Pate-Fires</u>, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. <u>Id.</u>

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." <u>Moore</u>, 572 F.3d at 523 (<u>citing</u> 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." <u>Moore</u>, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. <u>Wagner v. Astrue</u>, 499 F.3d 842, 851 (8th Cir. 2007); <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's

complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff asserts allegations of error with respect to the ALJ's assessment of his residual functional capacity and credibility.

## A. RFC Assessment

Plaintiff argues that the ALJ's RFC determination arose from an improper evaluation of opinion evidence.

Dr. West opined on November 20, 2007, and September 13, 2008, that plaintiff had significant limitations in work-related abilities which the vocational expert testified precluded from employment. The ALJ discounted her opinion as inconsistent with her own treatment records and the clinical findings of other examiners.

Dr. West is a treating physician and thus her opinion is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). While a treating physician's opinion is normally entitled to great weight, such an opinion does not automatically control, because the record must be evaluated as a whole. Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (internal quotations and citations omitted). Furthermore, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight." Soc. Sec. Ruling 96–5p, 1996 WL 374183, at *2 (July 2, 1996). Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation. Prosch, 201 F.3d at 1013 (quoting 20 C.F.R § 404.1527(d)(2)).

The ALJ stated that Dr. West's opinion was inconsistent with her treatment records and other evidence in the record.[16] In particular, the ALJ rejected Dr. West's

---

[16]Although the earliest office visit for which treatment notes exist is July 23, 2007, plaintiff's treatment history with Dr. West began much earlier. See Tr. 487 (on June 14, 2004, Dr. Scullin notes Dr. West prescribed Adderall).

opinion that plaintiff was likely to get into conflicts as unsupported by the record. (Tr. 27). Plaintiff had lost work because of problems getting along with others. (Tr. 382). In March 2008, Dr. West noted that plaintiff had had no anger outbursts, suggesting that such outbursts were a concern. In July 2008, plaintiff's girlfriend reported to Dr. West that she was walking on eggshells. (Tr. 701). Plaintiff told Dr. Guiley that he was seeking treatment because he "gets _angry_." (Tr. 588) (emphasis in original). He told Dr. Kuhn that he had a history of losing his temper, got into a lot of fights as an adolescent, and had at least one arrest for assault. (Tr. 956-57). He told Mr. Sklar that he was kicked out of several schools for dysfunctional behavior. (Tr. 808). Plaintiff told Dr. Hurley that one reason he stopped working in 2004 was that he was having conflict with others and had difficulty controlling his temper. (Tr. 962). Evidence in the record supports Dr. West's opinion that plaintiff was likely to get into conflicts.

The ALJ rejected Dr. West's finding that plaintiff had poor concentration, forgetfulness, and inattention, and was distractible and disorganized. (Tr. 621). Again, this finding is supported by other evidence in the record. For example, on September 26, 2008, plaintiff reported to Dr. West that he was forgetful and thought he was losing his mind. (Tr. 736). Treatment notes from several providers indicate that he missed appointments and lost his wallet, pill bottles, and prescriptions. He testified that he routinely lost his keys, forgot what he was doing, and failed to turn off the stove when cooking. (Tr. 139, 104). Testifying expert Dr. Horner opined that plaintiff could have marked limitations in maintaining concentration, persistence and pace as much as 20 percent of the time. (Tr. 118).

The ALJ also stated that the record did not support a finding of tearfulness. Drs. West, Kuhn, and Guilan all reported episodes of tearfulness. (Tr. 702, 706, 806, 592). Also contrary to the ALJ's finding, plaintiff occasionally expressed suicidal or morbid

thoughts. (Tr. 702, 806, 592, 594). The ALJ also incorrectly stated that plaintiff did not report depression until December 2007. (Tr. 26). Records from 2004 onward document treatment for depression. (Tr. 483). This is consistent with plaintiff's testimony that he became depressed following his lengthy recuperation from the 2002 nail gun injury to his knee and subsequent divorce.

The ALJ found that Dr. West's opinion was inconsistent with the report of consultative evaluator Mr. Sklar. In particular, the ALJ stated that plaintiff "did not indicate that he faced significant limitations as a result of his mental impairments. Instead, he reported to Dr. Sklar that despite his mental impairments he was allowed to spend time preparing his children for school, watching television, and sleeping each day." (Tr. 27). This is an accurate paraphrase of Mr. Sklar's report; however, these daily activities are not indicative of a capacity to maintain employment. In general, Mr. Sklar's report supports Dr. West's opinion: he noted that plaintiff had concentration deficits and depression and spent much of his day asleep. The ALJ discounted the GAF score of 45 that Mr. Sklar assigned, stating that it was inconsistent with the absence of psychiatric hospitalizations. A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000). While inpatient hospitalization can be a manifestation of "serious impairment," it is not a diagnostic criterion nor the only means by which serious impairment in functioning can be established.

The ALJ stated that, as of October 2009, plaintiff's diagnoses were changed to unspecified anxiety and depressive disorder. (Tr. 28). These diagnoses appear in the notes of plaintiff's primary care physician, Dr. Scullin. (Tr. 933-34). During the same time period, psychiatrist Dr. Kuhn listed plaintiff's diagnoses as Bipolar II and ADHD.

(Tr. 958). In May 2010, consultative evaluator Dr. Hurley found that plaintiff had fair to poor capacity in all functional areas, with the exception of maintaining personal appearance, and assigned a GAF score of 50.[17] (Tr. 959-60). The ALJ rejected this assessment of plaintiff's work capacity as inconsistent with plaintiff's good hygiene, cooperative and appropriate conduct during the interview, average intellectual functioning, and absence of delusions and hallucinations. (Tr. 28). The ALJ does not cite medical evidence to support his conclusion that plaintiff's interview presentation has diagnostic relevance with respect to these functional limitations. An ALJ "must not succumb to the temptation to play doctor and make [his] own independent medical findings." Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996).

The Court finds that the ALJ did not give proper reasons for discounting the opinions of Drs. West, Hurley, and Sklar. To the extent that the ALJ relied on the testimony of Drs. Reid and Horner, the Court notes that the opinions of examining sources are entitled to greater weight than those of non-examining sources. 20 C.F.R. § 1527(d)(1). The Court will remand this matter for further consideration.

## B. Credibility Determination

The ALJ found that plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms were not fully credible. On remand, the ALJ should reconsider plaintiff's credibility in light of the reassessment of the medical opinions. In addition, the ALJ should consider Dr. Hurley's opinion that plaintiff's physical problems

---

[17]In testimony relied on by the ALJ, Dr. Horner testified that a GAF of 50 was the cutoff between moderate and severe and was somewhat inconsistent with Dr. Hurley's checkmarks on the medical source statement. (Tr. 117-18). The ALJ interpreted Dr. Horner's testimony to mean that a GAF score of 50 was inconsistent with "the observed mild-to-moderate limitations . . . in social function and concentration, persistence and pace." (Tr. 29). Since Dr. Hurley did not observe mild-to-moderate limitations, a more reasonable interpretation of Dr. Horner's statement is that a GAF of 50 is higher than what would be expected in light of the limitations endorsed by Dr. Hurley.

and pain are a constant stressor that makes it difficult to deal with emotional issues. The ALJ should also consider plaintiff's testimony that his repeated abscesses and MRSA infections are stress related.[18] Finally, the ALJ should consider whether plaintiff's inconsistent compliance with his psychotropic medications is a symptom of his medical impairments. See Pate-Fires v. Astrue, 564 F.3d 935, 945-46 (8th Cir. 2009) (ALJ did not address whether plaintiff's failure to follow prescribed treatment was a manifestation of psychiatric disorders).

With respect to the credibility analysis, the Court makes the following additional observations: ample evidence in the record supports the ALJ's finding as not credible plaintiff's testimony that he had never worked in Texas (Tr. 81-82). See, e.g. Tr. 702 (on July 16, 2008, Dr. West notes that plaintiff went to Texas to work). The ALJ found that plaintiff quit the 2008 job for reasons unrelated to his impairments. (Tr. 18). Plaintiff stated that he quit because there was too much work and he was stressed out by "too many chiefs, not enough Indians," a reaction that is consistent with his mental impairments. (Tr. 702). The ALJ stated that plaintiff was using cocaine in 2006. (Tr. 28). The reference he cited stated that, as a youth, plaintiff drank to excess and used marijuana and cocaine. (Tr. 110, 591). There is no evidence that plaintiff used nonprescription drugs during the time frame under consideration.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

---

[18]The record documents treatment for cellulitis, abscesses, or MRSA infections on at least 13 occasions.

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2015.